

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| CASE NUMBER | 01 C 50445 | DATE | 10/15/2002 |
| CASE TITLE | Pierson vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiff's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion and order, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for a determination of Plaintiff's condition and capabilities as discussed in the attached order. Defendant's Motion for Summary Judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | OCT 16 2002 date docketed |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials |
| | Copy to judge/magistrate judge. | | 10/15/2002 date mailed notice |
| sp | courtroom deputy's initials | 02 OCT 16 AM 11:06 Date/time received in central Clerk's Office | sp mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| MICHAEL S. PIERSON, ) | |
| ) | |
| Plaintiff, ) | Case No. 01 C 50445 |
| ) | |
| v. ) | Magistrate Judge |
| ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael S. Pierson (Plaintiff), seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income Benefits (SSI) pursuant to section 1381 of the Social Security Act. This matter is before the Magistrate Judge pursuant to consents filed by both parties on February 12, 2002. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### I.  BACKGROUND

Plaintiff first filed an application for SSI on April 23, 1999, alleging that he has been disabled since October 7, 1998. (Plaintiff's memorandum at 1). His inability to work is based upon multiple fractures of the lumbar spine at L2 with compression and kyphosis resulting in severe stenosis of the central canal, chronic pain disorder, and adjustment disorder with depressed mood. (Plaintiff's

1

memorandum at 1). Plaintiff's application for benefits was initially denied on October 21, 1999. (Tr. 77-80). On December 10, 1999, Plaintiff filed a request for reconsideration. (Tr. 85-87). Plaintiff's request for reconsideration was subsequently denied on May 3, 2000. (Tr. 88-90). Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ) on May 19, 2000. (Tr. 91-93). On November 16, 2000, Plaintiff appeared, with counsel, before ALJ Robert T. Karmgard, who heard the testimony of the Plaintiff and a vocational expert. (Tr. 25-74). On February 23, 2001, the ALJ issued the decision that Plaintiff was not eligible for Supplemental Security Income. (Tr. 14). On February 27, 2001, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 10). On November 8, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 5-6). Plaintiff then sought review by this court.

## II. FACTS

Plaintiff, born in Rockford, Illinois, on June 29, 1953, is a forty-nine year old divorced man and has no children living with him. (Plaintiff's memorandum at 3). He is a high school graduate and is literate. (Plaintiff's memorandum at 3). Plaintiff's previous work experience includes work as a welder, packager, yard worker, delivery person, building maintenance person, and lab technician. (Defendant's memorandum at 2). Plaintiff claims disability as of October 7, 1998, based upon multiple fractures of the lumbar spine at L2 with compression and kyphosis resulting in severe stenosis of the central canal, chronic pain disorder, and adjustment disorder with depressed mood. (Plaintiff's memorandum at 1).

Plaintiff testified, at the hearing, that he suffers from the aforementioned medical conditions. (Tr. 25-74). When Plaintiff was asked how his condition affected his daily activities, he stated that

2

he cannot do much other than lay around and read or watch television. (Tr. 45). He cannot perform any household tasks such as vacuuming or sweeping due to his back pain. (Tr.45). Plaintiff can bathe and shave himself, but he has meals delivered to his door five days a week through Home Services. (Tr. 45). In addition, he is unable to drive. He does receive some assistance from his sister, who visits from Kentucky twice a month. (Tr. 45-47). Plaintiff's medication includes Hydrocodone, Vicoden, Lodeine, and Levaquin. (Tr. 110). He also takes acetaminophen and ibuprofen for his chronic pain. (Tr. 110). Plaintiff has been wearing a back brace since he left the hospital. (Tr. 44).

Christopher Yep, a certified rehabilitation counselor, testified before the ALJ as a vocational expert. (Tr. 60-61). The ALJ referred to Plaintiff's past work history, as mentioned above, and then posed a hypothetical to Mr. Yep concerning the ranges or basis of work that remained for an individual with those characteristics and limitations similar to Plaintiff. (Tr. 62-63). The ALJ directed him to assume an individual with Plaintiff's vocational characteristics and the following limitations: "the individual can lift and carry up to a maximum of twenty pounds occasionally and ten pounds frequently, sit, stand, and walk respectively, with normal breaks, for up to six hours each within an eight hour day. He may not climb ramps or stairs, balance, stoop, kneel, crouch and crawl more than occasionally. The individual further does not possess the capacity to recall or carry out complex or detailed instructions or maintain such extended attention or concentration as would be required to perform complex or detailed tasks at a sustained, workman-like pace. He would, however, retain the capacity to understand, recall, and carry out simple instructions to perform simple routine tasks at a sustained workman-like pace." (Tr. 63-64).

Mr. Yep answered that several jobs exist which can be performed by a person with those

3

limitations. (Tr. 64). Mr. Yep testified that such a person can perform work as welder or packaging person. (Tr. 64). The vocational expert stated that even if the individual were not able to perform work which requires the individual to set work goals or plan or schedule work to be done, that would not impact the work base. (Tr. 64-65). The ALJ asked a follow-up question requiring Mr. Yep to add the assumption that the individual could not stand or walk for a total of two hours in an eight hour day or for longer than fifteen minutes. (Tr. 39). Mr. Yep stated that the individual could perform sorting and assembly positions. (Tr. 65-66). In the region, the vocational expert stated there are 9,782 sorting jobs and 26,198 assembly positions that are sedentary in nature. (Tr. 66).

The vocational expert also reported that these numbers would not be impacted if that individual could only lift, carry, or pull ten pounds occasionally and five pounds frequently. (Tr. 66-67). The ALJ added another assumption that the individual could sit at least six hours in an eight hour day, but had to alternate between sitting and standing. (Tr. 67-68). The vocational expert reported that would be permissible, but if alternations at intervals of thirty minutes were mandated, that would eliminate all unskilled sedentary jobs. (Tr. 67-68). Plaintiff's attorney then examined Mr. Yep. (Tr. 68). Mr Yep testified that a protective turtle shaped vest worn by an individual would not impact the availability of these jobs. (Tr. 67-69).

### III. MEDICAL HISTORY

On October 7, 1998, Plaintiff fell off a ladder, approximately ten feet to the ground, and was hospitalized. (Plaintiff's memorandum at 2). While hospitalized at Swedish American Hospital, he was treated for a broken wrist. (Tr. 235). Plaintiff also underwent a CT scan of his lumbar spine which showed a comminuted and unstable fracture of the L2 vertebra with commuted vertebral body

4

fracture components and approximately sixty percent loss of height of the L2 body. (Tr. 180). There were also marked retropulsed osseous fragments into the L2 spinal canal, with evidence of a coexistent epidural hematoma that produced marked narrowing of the thecal sac at the L2 level. (Tr. 180). Findings at the 1-2 and 2-3 interspaces were compatible with additional broad-based disk herniations and/or a coexistent epidural hematoma. (Tr. 180). There was also a questionable hematoma at the L3 level. (Tr. 180).

Plaintiff also had his cervical spine imaged which showed minimal kyphosis in the upper cervical spine and mild degenerative disk disease at the C5-6 levels. (Tr. 182). A CT scan of Plaintiff's abdomen showed a mild right lower rib deformity with one or two fractures. (Tr. 183). Imaging of Plaintiff's thorasic vertebral body column appeared to be normal. (Tr. 186). While no back surgery was performed, Plaintiff was prescribed a lumbosacral orthosis (LSO) for use upon discharge from the hospital. (Tr. 179-186).

On October 17, 1998, Plaintiff went home after staying two weeks in the hospital. (Tr. 227). Dr. Yake, in his discharge summary, reported that Plaintiff had multiple fractures of the L2 vertebrae, and Plaintiff's treating doctors had tried to contact him, but have not been able to reach him since he left the hospital against medical advice. (Tr. 227). Dr. Yake also noted that he was worried because Plaintiff had no support system and pointed out that this was a "dangerous situation." (Tr. 227).

On November 12, 1998, Dr. Ronald Yake performed an examination on Plaintiff at Associated Neurosurgeons of Rockford. (Tr. 193-194, 208-211). Dr. Yake reported that Plaintiff had a severe fracture of the lumbar spine, and that he was developing forward ambulation. (Tr. 194). Dr. Yake also stated that Plaintiff had between a twenty and fifty percent reduced capacity for gross

5

manipulations, and more than a fifty percent reduced capacity for walking, bending, stooping, sitting, turning, climbing, pulling, traveling, and performing daily activities. (Tr. 194). Dr. Yake also reported that Plaintiff had trouble standing and had back pain. (Tr. 208).

In December of 1998, Dr. Yake and Dr. Danaher both reported that Plaintiff had no significant increase in lower back problems, and his wrist fracture was healing well. (Tr. 203, 206). Dr. Yake found that Plaintiff had intermittent numbness at times in his thigh and a compromise of the spinal canal. (Tr. 203). Dr. Yake noted that he encouraged his associate Dr. Alexander to evaluate Plaintiff. (Tr. 203). Dr. Danaher recommended doing further testing including an MRI scan of Plaintiff's lumbar spine. (Tr. 206).

On January 7, 1999, Dr. Todd Alexander evaluated Plaintiff's condition. (Tr. 201-202). Dr. Alexander found that Plaintiff has pain and neurologic findings related to an L2 burst fracture. (Tr. 201). Dr. Alexander also found that Plaintiff ambulates slowly, but independently, his left leg strength was normal, and he appeared to have good strength in his right leg. (Tr. 201). Dr. Alexander recommended that Plaintiff undergo surgery because the non-operative treatment had failed and prescribed Vicodin for pain. (Tr. 201-202).

On January 8, 1999, Dr. Danaher completed an Illinois Department of Public Aid Report of Incapacity. (Tr. 192). The doctor opined that Plaintiff had more than fifty percent reduced capacity for walking, bending, standing, stooping, sitting, turning, climbing, pushing, pulling, finger dexterity, fine and gross manipulations, and between a twenty to fifty percent reduced capacity to perform daily activities. (Tr. 192).

Plaintiff was then referred to neurosurgeon Dr. Yogesh Gandhi for an evaluation on January 15, 1999. (Tr. 198). Dr. Gandhi reported Plaintiff had a mildly weak left grip, his lower extremity

6

strength was full, but his straight-leg raising was negative bilaterally, causing him to have back pain. (Tr. 198). He ordered another set of X-rays and surgical decompression and stabilization. (Tr. 198). However, Plaintiff declined to undergo the surgery. (Tr. 20). In February 1999, an X-ray indicated his lumbar spine revealed marked compression of the L2 vertebra and notable degenerative disk and facet changes at the L5-S1 level. (Tr. 199).

On August 30, 1999, Plaintiff went to Dr. Kamlesh Ramchandani for a consultative examination for the Bureau of Disability Determination Services. (Tr. 298-299). Plaintiff reported symptoms of constant pain, for which he wears a turtle shell, and problems with frequent urination. (Tr. 298). Dr. Ramchandani reported that Plaintiff was alert; had a slow measured gait; had the ability to walk and dress himself; and had somewhat limited movement. (Tr. 298-299). During the CNS examination, the doctor reported that Plaintiff has reduced sensation involving the right thigh. (Tr. 299). The diagnosis was that Plaintiff has a compression fracture of the lumber spine at L2, chronic backache, and compressive radiculopathy involving the right lower extremity. (Tr. 299).

A second consultative examination was done by Dr. Kevin Thompson on January 28, 2000. (Tr. 312-316). The doctor reported that Plaintiff's gait was slow and that he had no deficits in squatting, rising, or heel-toe walking. (Tr. 314). Plaintiff's hearing, speech, and mental status were all normal. (Tr. 314). Dr. Thompson diagnosed him with a L2 vertebral fracture with retropulsed fragments. (Tr. 314).

On January 27, 2000, Dr. Gerald Hoffman, a psychiatrist, evaluated Plaintiff at the request of state disability examiners. (Tr. 317-319). Upon examination, Plaintiff was alert and spontaneous, but a little digressive. (Tr. 318). He stated that he felt somewhat depressed and did not have energy. (Tr. 318). His thought processes were normal and his affect appropriate. (Tr. 318). Dr. Hoffman

diagnosed Plaintiff with a pain disorder and an adjustment disorder with depressed mood. (Tr. 18).

On January 28, 2000, Dr. Kevin Thompson performed an internal medicine consultative examination on Plaintiff. (Tr. 312-315). Dr. Thompson found that Plaintiff had no specific neurological complaints from his injury, but he did have some inability to get up and down due to pain. (Tr. 314). Dr. Thompson also found that Plaintiff can bear weight and walk without a cane or crutch. (Tr. 314). Plaintiff's hand manipulations, hearing, speech, and mental status were all normal. (Tr. 314).

On October 4, 1999, a physical RFC assessment was completed by a DDS Physician (name unknown) (Tr. 302-309). No postural, manipulative, visual, communicative, or environmental limitations were indicated. (Tr. 302-306). The DDS Physician noted that Plaintiff's gait was slow and his back was tender. (Tr. 303). Plaintiff's exertional limitations included lifting fifty pounds, sitting six hours per day, and standing six hours per day. (Tr. 303).

On April 11, 2000, Dr. Hudspeth completed a mental RFC assessment as to Plaintiff. (Tr. 329-332). Dr. Hudspeth concluded that Plaintiff can not maintain concentration, persistence, and pace for complex or detailed work tasks, but he can understand, remember, and carry out simple and routine tasks. (Tr. 331). Dr. Hudspeth further opined that Plaintiff could communicate with coworkers and make ordinary work decisions. (Tr. 331).

## IV. **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or

8

substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision."

9

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D.Ill. 1995).

## V. __FRAMEWORK FOR DECISION__

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied Plaintiff's application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

---

[1] The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

10

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not,

the claimant will be found to be disabled.

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity since filing for Supplemental Security Income on April 23, 1999. (Tr.22).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff to have the following medically determinable impairments: severe degenerative disease of the lumbar spine, status-post L2 compression fractures, status-post fracture of the left wrist, status-post fracture of the fourth digit of the right hand, and depression. (Tr. 22).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from

severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet the requirements or equal the level of severity contemplated under any listing included in Appendix 1 to Subpart P, Regulations No. 4. (Tr. 15). The ALJ found that neither section 1.05 (B) (1) nor (2) is met or equaled. (Tr. 15). The ALJ noted that the record reveals no evidence of bone density deficit/osteoporosis, as required by this section.(Tr. 15-16). Further, the ALJ found no other listing in the 12.00 series that was met or equaled. (Tr. 16). The ALJ also noted that Plaintiff's testimony of disabling symptoms and limitations are not reliable for the reasons set forth in the body of the decision. (Tr. 22).

Plaintiff makes two arguments at Step 3. First, Plaintiff contends that the ALJ failed to properly analyze his inability to have recommended surgery performed pursuant to SSR 82-59, which was then in turn utilized to undermine the Plaintiff's credibility. (Plaintiff's memorandum at 6). However, the record does not support this contention. The ALJ, in his hearing decision, stated that there were various reasons for Plaintiff's failure to have surgery, including travel problems, and monetary issues, as well as Plaintiff's fear of the surgery. (Tr. 20). At the hearing, Plaintiff reported having to make three trips into Chicago to see Dr. Gandhi, but because he had no money or Medicaid, he was unable to have the surgery. (Tr. 53). Further, Plaintiff also owes over $46,000 to Swedish American Hospital, but he was unable to pay, so he did not have the surgery. (Tr. 43). Plaintiff did not explicitly explain his fear as a reason for not having the surgery, and Plaintiff's

14

reluctance to pursue any low-income alternatives appears to be another factor in the ALJ's decision. (Tr. 20). The ALJ gave proper consideration to all of these reasons, and substantial evidence exists to support the ALJ's finding.

Plaintiff also contends that the ALJ erred in failing to secure the opinion of a medical expert as to whether the Plaintiff met certain orthopedic definitions of disability as contained in the listings of impairments. (Plaintiff's memorandum at 6). The ALJ found, based on substantial medical evidence in the record, that Plaintiff did not meet the Listings at Section 1.05 (B) or (C). (Tr. 22). The relevant sections of Listings 1.05 provides:

> B. Osteoporosis, generalized (established by X-ray) manifested by pain and limitation of back motion and paravertebral muscle spasm with X-ray evidence of either:
>
> > 1. Compression fracture of a vertebral body with loss of at least 50 percent of the estimated height of the vertebral body prior to the compression fracture, with no intervening direct traumatic episode; or
> >
> > 2. Multiple fractures of vertebrae with no intervening direct traumatic episode; or
>
> C. Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:
>
> > 1. Pain, muscle spasm, and significant limitation of motion in the spine; and
> >
> > 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory an reflex loss.

The ALJ noted the record reveals no evidence of osteoporosis or other vertebrogenic disorder, thus neither of these sections is met. (Tr. 15). Nothing in the medical record supports Plaintiff's ability to meet either of these sections under 12.05. The ALJ's determination as to Step Three is supported by substantial evidence. The ALJ's determination as to Step Three of the

15

Analysis is affirmed.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff cannot return to past relevant work, to the extent that it was at the substantial gainful activity levels, as prior work ranged from heavy to light unskilled labor, both as performed in the State of Illinois and as existing in Illinois per vocational expert testimony. (Tr. 21). Plaintiff's previous work includes work as a welder, packager, yard worker, delivery person, building maintenance person, and lab technician. (Tr. 62-62, 136, 141). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

In performing the Analysis for Step Five, the ALJ determined that Plaintiff has the Residual Functional Capacity (RFC) for a limited range of sedentary work, reduced by both exertional and nonexertional limitations. (Tr. 23). The ALJ determined that Plaintiff's RFC includes the capacity to "lift/carry ten pounds occasionally and five pounds frequently; may stand/walk for up to a combined total of two hours in an eight hour day, but for no longer than fifteen minutes continuously; may sit with normal breaks for up to six hours in an eight hour day, but must be allowed to alternate between sitting and standing positions at intervals of one hour for a period of two to three minutes on each occasion; may not push/pull to a weight equivalence of ten pounds more than occasionally or to an equivalence of five pounds more than frequently; may not climb

ladders/ropes or scaffolds, but may otherwise climb ramps/stairs, balance, stoop, kneel, crouch, and crawl no more than occasionally; he does not possess capacity to recall or carry out complex/detailed instructions or to maintain such extended attention/concentration as would be required for the performance of complex/detailed tasks at a sustained workmanlike pace, but retains capacity to understand/recall/carry out simple instructions and to perform simple routine tasks at a sustained workmanlike pace; and he may not perform work which requires that he independently set work goals or plan/schedule work activities." (Tr. 22-23).

It is hard for the Magistrate Judge to ascertain the basis for the ALJ's RFC. The ALJ obviously did not rely on Plaintiff's testimony in determining Plaintiff's RFC because Plaintiff testified he can walk only about "10 minutes, 15 minutes tops" and can only pick up "sweat pants, ... , clothes, a book." (Tr. 59). Additionally, the ALJ appears reasonably not to have relied on an unnamed report wherein Plaintiff's RFC was determined to include occasionally lifting and/or carrying of fifty pounds, frequently lifting and/or carrying twenty five pounds, standing and/or walking about six hours in an eight hour day, and sitting about six hours in an eight hour day. (Tr. 303). Such a determination is far-fetched when viewed with Plaintiff's medical records. However, between Plaintiff's testimony and the "far fetched" RFC determination discussed above, the ALJ appears to have gone somewhere in between--but based on what? The last full examination of Plaintiff was by Dr. Gandhi in February 1999, approximately twenty months prior to the hearing date. X-rays were taken which indicated Plaintiff's lumbar spine had a marked compression of the L2 vertebra and notable degenerative disk and facet changes at the L5-S1 level. (Tr. 199). One month prior to Dr. Gandhi's full examination, in January 1999, Dr. Danaher opined that Plaintiff had more than fifty percent reduced capacity for walking, bending, standing, stooping, sitting, turning,

climbing, pushing, pulling, finger dexterity, fine and gross manipulations, and between a twenty to fifty percent reduced capacity to perform daily activities. (Tr. 192). In addition to Dr. Gandhi and Dr. Danaher, Dr. Yake performed an examination, in December 1998, on Plaintiff and reported that Plaintiff had a severe fracture of the lumbar spine, and that he was developing forward ambulation. (Tr. 194). After these three doctors examined Plaintiff, only two other doctors saw Plaintiff in regards to his physical aliments (Dr. Hoffman, psychiatrist, also saw Plaintiff but not to evaluate his physical aliments). These two doctors, Dr. Ramchandani, in August 1999, and Dr. Thompson, in January 2000, both did consultative examinations, at the request of Ms. Marilyn Ortiz-Rosas of the Illinois Department of Human Services, in which no x-rays were taken. Both doctors diagnosed Plaintiff as having a L2 vertebral fracture with limited movement. Obviously, as indicated by all the medical reports, Plaintiff has suffered a serious back injury. Absent from the medical reports of every doctor noted above is the extent of Plaintiff's capabilities to perform (i.e. how much weight or time) such tasks as walking, bending, standing, stooping, sitting, turning, climbing, pushing, pulling, finger dexterity, and fine and gross manipulations. The only notable exception to this is Dr. Danaher's determination that Plaintiff has a fifty percent reduced capacity to do the above mentioned activities. (Tr. 192). None of the medical reports before the Magistrate Judge provides a sufficient basis for RFC and the only reference to Plaintiff's current condition is from the Plaintiff himself.

The Seventh Circuit has stated that while an ALJ need not address every piece of evidence, he must build an accurate and logical bridge from the evidence to his conclusion. *Clifford v. APFEL*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ did not build an accurate and logical bridge from the medical report to Plaintiff's RFC, and as such, this court remands. On remand, the court orders that a qualified physician examine the Plaintiff (preferably one of the treating physicians) and bring up

18

to date the ALJ as to what exactly is Plaintiff's condition and what are his capabilities.

The ALJ's decision at Step Five is not supported by substantial evidence. Therefore, the Magistrate Judge orders that the ALJ's determination as to Step Five of the Analysis be remanded.

## VII. CONCLUSION

For the above stated reasons, the Magistrate Judge orders Plaintiff's Motion for Summary Judgment is granted and the case is remanded for a determination of Plaintiff's capabilities. It if further ordered that Defendant's Motion for Summary Judgement is denied..

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 10/15/02